

**SIGNED this 04 day of March, 2009.**

_____
**John C. Cook**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Joint Admin.** |
| **Propex Inc.,** *et al.* | ) | **No. 08-10249** |
| | ) | **Chapter 11** |
| Debtor | ) | |
| ─────────────────────────) | | |
| | ) | |
| **The Official Committee of Unsecured** | ) | |
| **Creditors of Propex Inc.** *et al.* | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | **Adv. No. 08-1136** |
| | ) | |
| **BNP Paribas** | ) | |
| | ) | |
| Defendant | ) | |

## M E M O R A N D U M

This adversary proceeding is before the court on the defendant's motion to dismiss

Counts I, III, IV, V, and VI of the plaintiff's complaint. The court has reviewed the motion and

the supporting and responsive briefs and, for the reasons stated below, will grant the motion in part and deny it in part.

## I.

When presented with a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Federal Procedure,[1] the court must accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007). As the Supreme Court recently explained:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted). There must be enough factual matter to make it plausible that the plaintiff is entitled to relief, i.e., to "raise a reasonable expectation that discovery will reveal evidence" giving rise to a right to relief. *Id.*, 127 S. Ct. at 1965.

---

[1] That rule is made applicable in bankruptcy adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

## II.

The allegations of the complaint pertinent to Count I are that, on or about January 31, 2006, Propex Fabrics Inc. (now known as Propex Inc., and sometimes referred to hereinafter as "Propex") entered into a credit agreement with various lenders, with the defendant as their administrative agent, pursuant to which the lenders extended a $360 million credit facility including a $260 million term loan, a $50 million revolving credit facility, and a $50 million bridge loan. The credit was secured by liens on substantially all of Propex's real and personal property, including all of the stock of its domestic subsidiaries and 66% of the stock of its foreign subsidiaries. The credit was guaranteed by Propex's domestic subsidiaries, which granted the lenders liens on substantially all of their real and personal property, including all of the stock of the domestic subsidiaries and 66% of the stock of the foreign subsidiaries. The credit was also guaranteed by Propex Fabrics Holdings Inc., which granted the lenders security interests in all of the stock of Propex Fabrics.

On or about January 26, 2007, the parties entered into a Second Amendment to Credit Agreement and Limited Waiver, which waived Propex's obligations to comply with certain financial covenants for the fourth quarter of 2006 and relaxed the covenants for 2007 and the first quarter of 2008. After that, the original covenants of the original credit agreement went back into effect. In exchange for those accommodations, Propex was required to make a principal reduction of $20 million and the interest rate on the credit facility was increased. The complaint alleges that the lenders knew or should have known that Propex could not satisfy the relaxed cove-

nants and knew that Propex could not satisfy the original covenants when they sprang back into effect in the spring of 2008.

Count I of the complaint seeks the avoidance of the Second Amendment to Credit Agreement and Limited Waiver as a constructively fraudulent conveyance under the Bankruptcy Code and Tennessee law, contending that Propex received less than fair consideration in exchange for the waiver and relaxation of financial covenants. The plaintiff asserts that the waiver and relaxation had no value because Propex could not satisfy the covenants. The plaintiff seeks the recovery of the $20 million principal reduction and the nullification of the interest rate increase.

The motion to dismiss this count contends that, "[a]s a matter of law, a payment made on account of antecedent debt, as in the Second Amendment transaction, is a transfer made for reasonably equivalent value." The court agrees. As the Sixth Circuit has recognized, *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, 196 F. App'x 337, 343 (6th Cir. 2006), the Bankruptcy Code's fraudulent conveyance statute expressly provides that "value" includes the satisfaction of an antecedent debt, 11 U.S.C. § 548(d)(2)(A). The Uniform Fraudulent Transfer Act, as enacted in Tennessee, includes a provision to the same effect. Tenn. Code Ann. § 66-3-304(a). Propex received "reasonably equivalent value" for the $20 million payment as a matter of law because the payment reduced the principal balance of the indebtedness dollar-for-dollar. *Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 642 (Bankr. S.D. Ohio 2006); *see Wilkinson*, 196 F. App'x at 342-43 (debtor received reasonably equivalent value for payment of debt to third party because payment reduced debtor's debt dollar for dollar).

As for the interest rate increase, the court concludes that the waiver of the default result-ing from Propex's failure to satisfy the financial covenants for the fourth quarter of 2006 and the relaxation of the requirements of the covenants for the next five quarters constituted "reasonably equivalent value" for the increase. In *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01 Civ.6209 (DC), 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002), the bankruptcy trustee sought to avoid a grant of a security interest to secure a pre-existing debt as a fraudulent conveyance. The district court found reasonably equivalent value as a matter of law in the lend-er's waiver of its right to exercise its remedies upon default:

> Silverman was in default, and it is undisputed that as a consequence HUB could have demanded immediate payment and taken steps to collect on all Silverman's obligations. Instead, HUB waived its rights to immediately pursue its remedies and it agreed to extend Silverman's obligations. In return, Silverman gave HUB a security interest in its inventory, but this collateral was being given for the exten-sion of the loans and HUB's agreement to forbear from pursuing its remedies.

*Id.*, 2002 WL 31412465, at *6 (citing *Anand v. Nat'l Rep. Bank*, 239 B.R. 511, 517-18 (N.D. Ill. 1999); *Ward v. Bldg. Material Distribs. (In re Ward)*, 36 B.R. 794, 799 (Bankr. D.S.D. 1984)).[2] Likewise, the lenders in this case could have declared a default and pursued collection rights on account of Propex's failure to satisfy the financial covenants for the fourth quarter of 2006. It did not do so, in exchange for the principal reduction and the increase in interest rate.

---

[2] The *Anand* and *Ward* cases, cited in *M. Silverman Laces*, also held that agreements to waive a default or forbear from enforcing a debt was reasonably equivalent value for a grant of a security interest. Other cases so holding include *Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 330 B.R. 362, 364 (S.D.N.Y. 2005) (so holding as a matter of law).

The plaintiff contends that the waiver of the default and temporary relaxation of the financial covenants had no value at all because there was no chance that Propex could comply with the relaxed requirements during 2007 or the first quarter of 2008 or the original requirements starting with the second quarter of 2008. A similar argument was made – and rejected – in the *M. Silverman Laces* case:

> The Trustee argues that when HUB extended the debt in January 1997 and took back a security interest in the inventory, HUB did not provide any "real benefit" to Silverman. As a matter of law, that is not so. HUB could have declared Silverman in default and demanded immediate payment on all its obligations and HUB could have pursued all the remedies available to it by virtue of the default. By agreeing to forbear and to extend the loans, HUB gave Silverman "breathing room" – an opportunity to avoid default, to facilitate its rehabilitation, and to avoid bankruptcy. The "breathing room" turned out to be short-lived, but not because of HUB's actions.

*In re M. Silverman Laces, Inc.*, 2002 WL 31412465, at *6 (citation omitted). Likewise here, the lenders could have declared Propex in default, demanded immediate payment on all its obligations, and pursued all the remedies available to them by virtue of the default. By agreeing to forbear and to relax the financial covenants, the lenders gave Propex "'breathing room' – an opportunity to avoid default, to facilitate its rehabilitation, and to avoid bankruptcy." The court holds that that opportunity constitutes reasonably equivalent value for the interest rate increase as a matter of law, irrespective of the fact that "[t]he 'breathing room' turned out to be short-lived."

It is true, as the plaintiff points out, that the determination of what constitutes "reasonably equivalent value" is a question of fact. *Wilkinson*, 196 F. App'x at 341. However, that does not mean that summary judgment may not be granted on the issue. *See id.* at 341-43 (affirming grant of summary judgment on "reasonably equivalent value" issue). The plaintiff's allegations that

Propex did not receive reasonably equivalent value in exchange for the principal payment and interest rate increase, solely because the forbearance and temporary relaxation of financial covenants did not, it turns out, save the company, are insufficient to "raise a right to relief above the speculative level." *Twombley*, 127 S. Ct. at 1965.

### III.

Count III of the complaint in this case is denominated by the plaintiff as "Claim for Deepening Insolvency Under Tennessee Law." It charges that the defendant lender "exert[ed] influence" over the debtors owing to their financial vulnerability and therefore owed them fiduciary duties. Using this influence, it induced the debtors to agree to the loans and provisions mentioned in the Second Amendment to Credit Agreement and Limited Waiver, contending that lending the debtors money under the amendment deepened the debtors' insolvency by requiring the prepayment of $20 million, raising the previous interest rate, and permitting the debtors to remain operational with the additional funding. It further charges that the defendant made false assurances of future loans. The defendant moves to dismiss this count on the grounds that Tennessee courts do not, and will not, recognize deepening insolvency as a cause of action. The question before the court is whether the Tennessee Supreme Court would recognize deepening insolvency as a tort if given the opportunity, for up to now no Tennessee state court has addressed it.

The plaintiff relies entirely on *Limor v. Buerger (In re Del-Met Corp.)*, 322 B.R. 781, 813 (Bankr. M.D. Tenn. 2005), a case in which the issue was whether "the Tennessee Supreme Court would recognize deepening insolvency as an actionable breach of duty." The bankruptcy court for the Middle District of Tennessee held that it would, and that "an insolvent corporation suffers

a distinct and compensable injury when it continues to operate and incur more debt." Since *Del-Met* was decided, however, two of the leading cases upon which it relied, *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir. 2001) and *Official Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Technologies, Inc.)*, 299 B.R. 732 (Bankr. D. Del. 2003), have lost a good deal of their support, and the theory behind deepening insolvency has come into serious question.

In *Del-Met*, the bankruptcy court decided to follow *Lafferty*, and after a lengthy quotation from *Lafferty* concluded that "[t]he analysis in *Laffery* is sound." In *Laffery* the Third Circuit had decided that Pennsylvania would recognize deepening insolvency as a valid cause of action. The court in *Del-Met* followed *Lafferty* to its conclusions that (1) the theory of deepening insolvency was "essentially sound," *R.F. Lafferty & Co.*, 267 F.3d at 349, (2) growing acceptance of the theory "confirm[ed] its soundness," *id.* at 350, and (3) the principle that there is no wrong without a remedy favored recognition of the theory, *id.* at 351. Since *Lafferty* was decided, however, its critics have multiplied along with serious questions about how the theory is defined, to whom it applies, whether it is a cause of action or a measure of damages, and whether it represents sound policy.

In *Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.)*, 365 B.R. 91 (Bankr. S.D. Ohio 2007), the court observed that "a growing number of courts regard deepening insolvency with skepticism," *id.* at 116, and the court rejected deepening insolvency as a cause of action under Ohio law, noting:

Even the Third Circuit itself, which has recently revisited the issue, questions the
continuing validity of the claim and whether its previous decision in *Lafferty* was
correctly decided. While the Third Circuit reiterates that deepening insolvency
remains a cause of action under Pennsylvania law, the court suggests that the
cause of action should not be expanded to negligent acts nor should the doctrine
necessarily be extended to other states.

*Id*. at 117 (citing *Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.)*, 448 F. 3d 672,

680, 680 n.11 (3d Cir. 2006)).

Many courts and commentators, in a rising concert, question the soundness of the theory,

especially as applied to situations like the present one involving the alleged deepening insolven-

cy of a company by means of ordinary loans to it. There is a growing realization that loans do

not of themselves deepen insolvency: they are balance sheet neutral because the incoming loan

proceeds balance the new repayment obligation. "*In short, a new loan, however onerous or ill-

advised, can never 'deepen' balance-sheet insolvency.*" Sabin Willett, *The Shallows of Deepen-

ing Insolvency*, 60 Bus. Law. 549, 553 (2005). If anything, it is the unwise spending of the loan

proceeds that deepens a company's insolvency:

A commercial loan facility is an asset in the lower-case sense. It is a tool
that a board may use or leave on the shelf, qualitatively no different than a willing
vendor, a work force, an available production line, a warehouse full of sheet
metal, or any of the other components of an operating enterprise. Management
may elect–or decline–to put such tools to use; it may decide to hammer the metal
into machines or sell it for scrap; it may devote the loan proceeds to salaries, or
invest them in treasury bills, or leave them undrawn. *When we penetrate the
confused rationale of deepening insolvency cases brought against lenders, we
always find that the real gravamen of the complaint is that the board continued
operating when it should not have done [so]. The not-so-subtle leap is that the
lender should be accountable for this.*

*Id*. at 556 (emphasis added). Mr. Willett's article goes on to draw several conclusions:

1. There is no valid "cause of action" for deepening insolvency.

2. Loans do not deepen insolvency. Although improvident use of firm assets (including credit but not limited to credit) may cause harm, the borrower is responsible for the uses to which credit is put.

3. The deepening of a firm's insolvency is not an independent form of corporate damage. Where an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation.

4. The law of fraud, equitable subordination, and fraudulent transfer occupy the field in cases where lending to insolvent borrowers is challenged.  Where those legal regimes provide no remedy, "deepening insolvency" should afford none.

*Id*. at 575. Further recent scholarly criticism of deepening insolvency in its various iterations is found in David C. Thompson, *A Critique of "Deepening Insolvency," A New Bankruptcy Tort Theory*, 12 STAN. J. L. BUS. & FIN. 536 (2007) (arguing that deepening insolvency cause of action is "fundamentally flawed"), and Ian T. Mahoney, *The CitX Decision*: *Has the Tort of "Deepening Insolvency" Gone Bankrupt?,* 52 VILL. L. REV. 995 (2007) (noting the "unmistakable and growing trend, within federal jurisprudence, toward significantly restricting claims for deepening insolvency").

Nor can this court find any "growing acceptance" of the theory to confirm its soundness . Quite the reverse. A recent critique of the theory appears in *Trenwick America Litigation Trust v. Billett*, 931 A.2d 438 (Del. 2007) (unpublished table decision), *available at* 2007 WL 2317768, wherein the Supreme Court of Delaware, adopting the opinion written below by the Court of Chancery in *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), held that Delaware did not recognize deepening insolvency as a cause of action

against corporate directors who allegedly had deepened Trenwick America's insolvency by causing it to expand its indebtedness.

Previous to *Trenwick,* a bankruptcy court sitting in Delaware had held (in a different case) that Delaware would recognize deepening insolvency if given the chance, stating that, "based on the Third Circuit's decision in *Lafferty* and the Delaware courts' policy of providing a remedy for an injury, I conclude that the Delaware Supreme Court would recognize a claim for deepening insolvency when there has been damage to corporate property." *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 751 (Bankr. D. Del. 2003).[3] When it got the chance, however, the Delaware Supreme Court rejected the bankruptcy court's analysis in *Exide*. Observing that "deepening insolvency has been discussed at length in federal jurisprudence, perhaps because the term has the kind of stentorious academic ring that tends to dull the mind to the concept's ultimate emptiness," *Trenwick*, 906 A.2d at 204, the Delaware court went on to criticize overenthusiastic federal courts for inflicting new causes of action on unwilling states:

> In this case the Litigation Trust has not stated a viable claim for breach of fiduciary duty. It may not escape that failure by seeking to have this court recognize a loose phrase as a cause of action under our law, when that recognition would be inconsistent with the principles shaping our state's corporate law. In so ruling, I reach a result consistent with a growing body of federal jurisprudence, which has recognized that those federal courts that became infatuated with the concept, did not look closely enough at the object of their ardor. Among the earlier federal decisions embracing the notion—by way of a hopeful prediction of state law—that deepening insolvency should be recognized as a cause of action admittedly were

---

[3]    This is the very same reasoning used by the court in *Del-Met* to declare that Tennessee would recognize a cause of action for deepening insolvency. Indeed, *Del-Met* relied on *Exide* as well as *Lafferty*.

three decisions from within the federal Circuit of which Delaware is a part. *None of those decisions explains the rationale for concluding that deepening insolvency should be recognized as a cause of action or how such recognition would be consistent with traditional concepts of fiduciary responsibility.*

*Id.*, at 206-07 (emphasis added). Two of the three decisions referred to from within the Third Circuit were *Lafferty* and *Exide. Id.* at 206 n.106.

A bankruptcy court in Ohio has recently predicted that Ohio would not recognize the supposed tort. In the *Amcast* case, the court stated that "the tide has turned and courts are increasingly reluctant to recognize deepening insolvency as a legitimate claim." *Amcast Indus.* Corp., 365 B.R. at 118. It went on to follow *Trenwick* in finding that the theory, at least as applied to director liability, was redundant of existing Ohio causes of action and therefore useless.

Following reasoning similar to that in *Amcast*, a Texas bankruptcy court has held that Texas would not recognize deepening insolvency as a separate tort because it was "substantially duplicated by torts already established in Texas."  *Official Comm. of Unsecured Creditors of Vartec Telecom, Inc. v. Rural Telephone Fin. Coop.*, 335 B.R.631, 644 (Bankr. N.D. Tex. 2005). The plaintiff had sued the secured lender for making loans to the debtor when it knew the debtor was in financial distress, much as plaintiff in the present case is alleged to have done. The bankruptcy court concluded:

> The wilful and malicious lending of money is not a tort in Texas and likely will not be recognized as one anytime soon through a theory of deepening insolvency. To maintain a cause of action against a lender under such a theory, the complaint must show that the lender took over control of the operations of the debtor and then breached its fiduciary duties. The facts pled . . . do not contain specific facts that show that the [defendant] controlled the actions or took over the management of [the debtor].

*Id*. at 646.

To the same point is *Kittay v. Atlantic Bank (In re Global Service Group LLC)*, 316 B. R.
451 (Bankr. S.D.N.Y. 2004), wherein the trustee sued debtor's bank for allegedly making loans
to the debtor while knowing they could not be repaid. The court dismissed the deepening insol-
vency claim:

> The Complaint alleges, in substance, that Atlantic Bank should be liable for Glo-
> bal's "deepening insolvency" because the bank made a loan that it knew or should
> have known Global could never repay. This may be bad banking, but it isn't a
> tort. A third party is not prohibited from extending credit to an insolvent entity; if
> it was, most companies in financial distress would be forced to liquidate.

*Id.* at 459. The court concluded that the plaintiff "wrongly assumes that prolonging the life of an
insolvent corporation that continues to incur debt, without more, states a claim for relief." *Id.* at
461.

In Tennessee, as elsewhere, a bank ordinarily owes no fiduciary duty to its borrower. *Oak
Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App.)
("[D]ealings between a lender and borrower are not inherently fiduciary absent special facts and
circumstances."), *permission to appeal denied* (Tenn. 1992); *Power & Telephone Supply Co. v.
SunTrust Banks, Inc.*, No. 03-2217 M1/V, 2005 WL 1329208 (W.D. Tenn. May 10, 2005) ("[I]n
Tennessee a  fiduciary duty does not exist as a matter of law between a bank and its custo-
mers."). To permit the recovery of damages against a bank for making a loan to a distressed
borrower who bungles the benefit of the loan and winds up in bankruptcy would be a great leap
beyond current law which permits recovery only where (1) the bank is actually in control of the

borrower, (2) the bank therefore owes the same fiduciary duties to it that anyone in control of the

corporation would, and (3) the bank then breaches those fiduciary duties. This regime obtains in

nearly every jurisdiction, including Tennessee, and so the question is whether to predict that

Tennessee would change it in order to embrace a deepening insolvency regime.

The Tennessee Supreme Court has been reluctant to recognize new causes of action

where recognition would work a change in state public policy. In *Smith v. Gore*, 728 S.W.2d 738

(Tenn. 1987), for example, the court, although noting its previous acceptance of the tort of

wrongful birth, refused to authorize as damages the expenses of rearing a child wrongfully born

(as the result of a tubal ligation that failed) to maturity. It saw that it had to choose between two

public policy considerations concerning the responsibility for supporting children, and it de-

clined to extend financial responsibility for supporting a wrongfully born child to anyone other

that its parents, who were the responsible parties under the current laws and public policy of the

state. *Id.* at 750-51. The court thought it should not decide to change state public policy, parti-

cularly where there were competing policy positions, the superiority of which was disputed:

> For the Court to find that no public policy prevents the continuing devel-
> opment of the common law is wholly different from positively declaring the pub-
> lic policy of the State. This observation is especially pertinent to any case in
> which the Court must determine which of several competing public policies
> represents the most compelling and controlling public policy for this State. The
> Court simply does not function as a forum for resolution of such generalized
> public issues; rather, it must decide the legal case or controversy presented by the
> particular parties before it.
>
> The diversity of rationales adopted by courts in other States concerning
> this issue is of itself convincing evidence that the policies involved tend to con-
> flict, as many reasonable people have disagreed over the proper outcome of these
> cases. Not only have these courts divided sharply over the recognition of this type

of action, but the courts that provide various degrees of recovery cannot agree
about the reasons for the results they reach.

*Id*. at 747 (citations omitted). With the dispute raging about whether malpracticing surgeons

should be liable for the expenses of raising a child to maturity or not, the Tennessee Supreme

Court stuck to the state's extant law and held they were not.

In a similar case involving the question of whether Tennessee courts should create a new

cause of action for the loss of parental consortium in personal injury actions, the Tennessee

Court of Appeals decided that the answer was for the legislature, not the courts, and so declined

to recognize actions for loss of parental consortium:

> In drawing the line between cases where alterations to common law should and
> should not be attempted, it is well to keep in mind the novelty and magnitude of
> the proposed change. In cases where the consequences are apt to be far-reaching,
> deference to the legislature, absent extraordinary circumstances, is more likely to
> be appropriate.

*Still by Erlandson v. Baptist Hosp.*, 755 S.W.2d 807, 812 (Tenn. Ct. App. 1988).

Thus, whether the proposed creation of law would affect an existing statutory scheme, as

in *Smith*, 728 S.W.2d at 751 (noting the "legislative enactment of such comprehensive statutory

schemes controlling child custody and support"), or the common law, as in *Still*, Tennessee

courts appear to be careful about pronouncing the arrival of new legal doctrine where the policy

it represents is still actively debated and would have policy consequences. Hardly a better exam-

ple for the application of these considerations could be found than the current battle over deepen-

ing insolvency. Assuming for the moment that deepening insolvency is something more than the

-15-

extant tort of breach of fiduciary duty, the consequences of holding officers and directors liable

for authorizing borrowing during a difficult time might be that all attorneys recommend to their

officer and director clients that they resign and flee at the first sign of trouble, leaving the com-

pany without adequate management. If the lending bank is also to face liability, how many com-

panies will be able to obtain a loan during a rough patch? What effect would that have on the

banking business within and without the state? Are current damages for breach of fiduciary duty

inadequate in some way?

The current state of affairs with regard to deepening insolvency, as the court sees it, is

that the theory is still obscure and difficult to distinguish from existing torts, that it duplicates

existing legal remedies, and that much scholarly and judicial opinion has recently turned against

it. It is unknown to the Restatement (Second) of Torts. Since damages under Tennessee law are

already available for fraud and breach of fiduciary duty and, since those damages are, after all,

designed to provide full compensation for injuries suffered, it must be asked what the Tennessee

courts would have to gain by recognizing deepening insolvency as a new tort or measure of dam-

ages heretofore overlooked in the long march of corporate jurisprudence. Upon these considera-

tions, and considering that the courts of Tennessee do not lightly adopt novel tort theories when

tort law is so closely entwined with the state's public policy, this court thinks that Tennessee

courts would probably not spring forward to embrace what has proven to be a legal tar baby or

endorse what may be little more than a "loose phrase."  Accordingly, the court will dismiss

Count III of the complaint insofar as it alleges deepening insolvency.

# IV.

The allegations of the complaint pertinent to Count IV are that, on or about June 13, 2006, Propex Fabrics Inc. changed its name to Propex Inc. and Propex Fabrics Holdings Inc. changed its name to Propex Holdings Inc.[4] The plaintiff asserts that the Uniform Commercial Code financing statement filings were not amended until December 2006 and, as a result, the reperfection of the security interests at that time constitutes a constructively fraudulent conveyance avoidable under the Bankruptcy Code and Tennessee law.

Under Article 9 of the Uniform Commercial Code as enacted in Tennessee,[5] a secured party has four months to amend a financing statement (UCC-1) that has become "seriously misleading" on account of the debtor's name change. Tenn. Code Ann. § 47-9-507(c). "[A] financing statement that fails sufficiently to provide the name of the debtor in accordance with § 47-9-503(a) is seriously misleading." *Id.* § 47-9-506(b). "If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with § 47-9-503(a), the name provided does not make the financing statement seriously misleading." *Id.* § 47-9-506(c). "A financing statement sufficiently provides the name of the debtor: . . .

---

[4] The complaint also alleges that two other affiliated debtors also changed their names, to Propex Geosolutions Corporation and Propex Concrete Systems Corporation, but it does not allege those entities' original names.

[5] The court will assume, for the purposes of the motion to dismiss only, either that Tennessee's enactment of Article 9 governs, *see* Tenn. Code Ann. §§ 47-9-301(1), 47-9-307(b)(3) (law of state where multi-location debtor has chief executive office governs), or that the version of Article 9 as enacted by the state whose version governs is identical to that of Tennessee.

[i]f the debtor is a registered organization, only if the financing statement provides the name of the debtor indicated on the debtor's formation documents that are filed of public record in the debtor's jurisdiction of organization to create the registered organization and that show the debtor to have been organized, including any amendments to those documents for the express purpose of amending the debtor's name." *Id.* § 47-9-503(a)(1). Thus, if a debtor changes its name to a name that would not be disclosed by a search of the filing office's records under the old name, the obligation to amend the financing statement within four months comes into play.

In this proceeding, the plaintiff has not alleged that the original UCC-1s would not be disclosed by a search under the debtors' new names. Indeed, it seems likely that a search for "Propex Fabrics Inc." and "Propex Fabrics Holdings Inc." likely *would* disclose "Propex Inc." and "Propex Holdings Inc.," respectively. The complaint's "labels and conclusions" that amendments to the financing statements were required are insufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. at 1965.

Moreover, the Bankruptcy Code's fraudulent conveyance statute expressly provides that "value" includes the securing of an antecedent debt, 11 U.S.C. § 548(d)(2)(A), and the Uniform Fraudulent Transfer Act, as enacted in Tennessee, includes a provision to the same effect, Tenn. Code Ann. § 66-3-304(a). The transfer that Propex made to the lenders in this proceeding was the security interest, not the perfection of the security interest. The untimely perfection has the effect of changing the effective date of the transfer, 11 U.S.C. § 548(d)(1), but the transfer was the transfer of the security interest, not the reperfection of the security interest. By statute, that transfer was made for value, and the complaint does not allege that the credit facility received in

exchange was not "reasonably equivalent" to the security interest. The value need not be received in exchange for the perfection of the security interest, but only in exchange for the granting of the security interest. An untimely perfection of a security interest securing an antecedent debt may be avoidable as a preferential transfer, *see* 11 U.S.C. § 547; *In re AppliedTheory Corp.*, 330 B.R. at 363 n.2, but it is not avoidable as a fraudulent transfer. *Provident Hosp. & Training Ass'n v. GMAC Mortgage Co. (In re Provident Hosp. & Training Ass'n)*, 79 B.R. 374, 378-79 (Bankr. N.D. Ill. 1987). As one bankruptcy court explained:

> It may be that the Debtor has confused a fraudulent conveyance with a preference. If a debtor gives a mortgage to secure a debt it already has—an antecedent debt—and meets the other statutory requirements (such as, *inter alia*, insolvency, a transfer within the statutory time period, and the requirement that the recipient receive more than it would in a chapter 7 liquidation), the giving of that mortgage may be a preference, but it is not a fraudulent conveyance.

*In re Kaplan Breslau Ash, LLC*, 264 B.R. 309, 330 (Bankr. S.D.N.Y. 2001); *accord, e.g.*, *In re AppliedTheory Corp.*, 330 B.R. at 363 ("[A] debtor's grant of a security interest in its assets to a lender who has previously given the debtor a cash loan may not be considered a fraudulent conveyance."); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 301 B.R. 801, 805-06 (Bankr. S.D.N.Y. 2003) ("Past consideration is good consideration. . . . "[T]he preferential transfer does not constitute a fraudulent conveyance.").

The complaint does not allege sufficient facts to raise above the "speculative level" that the security interest became unperfected four months after the name changes. Moreover, even if the security interest became unperfected, that would merely change the date of the transfer of the security interest for "fraudulent conveyance" purposes to the date of reperfection. The complaint

-19-

does not allege that the transfer of the security interest was made for less than reasonably equiva-lent value. Accordingly, Count IV of the complaint will be dismissed.

## V.

Count V of the complaint asserts that the lenders failed to amend the Uniform Commer-cial Code filing made with respect to fixtures located at Propex's real property located in Berrien County, Georgia. Accordingly, contends the plaintiff, the lien on the fixtures is avoidable under § 544 of the Bankruptcy Code.[6]

The pertinent provisions of UCC Article 9 as enacted in Georgia are identical to the Ten-nessee provisions discussed in Part IV of this opinion. Ga. Code Ann. §§ 11-9-507(c), 11-9-503-(a), 11-9-506(b), (c). Thus, for the same reasons, the complaint's "labels and conclusions" that amendments to the financing statements were required are insufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. at 1965. Accordingly, Count V will be dismissed.

## VI.

The single fact pertinent to Count VI of the complaint is that the security agreements be-tween the debtors and the defendant purport to include grants of security interests in the environ-mental permits listed on Exhibit C. The plaintiff contends that applicable regulations provide that

---

[6] The complaint actually asserts that there is no valid lien on the real property itself, but the only ground for avoidance alleged relates only to the fixtures.

a permittee does not have any property right or interest in such permits, so the debtors could not grant security interests therein.

While the body of the complaint indicates that the permits in question were issued by state and federal governmental agencies, the only permits listed on Exhibit C to the complaint are three Georgia air quality permits, a Georgia storm water discharge permit, and a Tennessee storm water discharge permit. The complaint does not make reference to the specific regulatory provisions stating that permittees have no property interest in these types of permits, but the brief in opposition to the motion to dismiss does. Section 70.6(a)(6)(iv) of Title 40 of the Code of Federal Regulations does appear to require state air quality operating permits to include language providing that "[t]he permit does not convey any property rights of any sort." Similarly, § 391-3-6-.16(8)(b) of the Georgia Administrative Code states that "[t]he issuance of a [storm water discharge] permit does not . . . [c]onvey any property rights of any sort." While the plaintiff cites no regulation with respect to Tennessee storm water discharge permits, it alleges that the permit itself provides that it "does not convey any property rights of any sort."

"A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral." Tenn. Code Ann. § 47-9-203(a); Ga. Code Ann. § 11-9-203(a). "[A] security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." Tenn. Code Ann. § 47-9-203(b)(2); Ga. Code Ann. § 11-9-203(b)(2). The complaint sufficiently alleges that the debtors do not have "rights in" the air quality and storm water discharge permits. Assuming those allegations are true, the defendant's

security interest in the permits never attached even if they did fall within the scope of the se-curity interest's description of the collateral. Accordingly, the court will deny the motion to dis-miss Count VI of the complaint.

### VII.

For the foregoing reasons, an order will enter an order granting the defendant's motion to dismiss Counts I, III, IV, and V of the complaint but denying the motion to dismiss Count VI.

# # #